IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ROBERT W. KINGSLEY,

**Plaintiff,**

vs.                                                    No. CIV 02-0467 WDS

JO ANNE B. BARNHART, Commissioner
of the Social Security Administration,

**Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse or Remand Administrative Agency Decision filed on January 17, 2003. Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security, who determined that Plaintiff was not eligible for disability insurance benefits or supplemental security income from his alleged onset date of January 30, 1997 until he became disabled on June 1, 2001. The Court, having considered Plaintiff's Motion **[docket # 10]** and Memorandum Brief **[docket # 11],** Defendant's Response **[docket # 17],** Plaintiff's Reply **[docket # 18],** the administrative record and applicable law, finds that Plaintiff's Motion should be **GRANTED IN PART,** and that this matter should be remanded to the Commissioner for further proceedings in accordance with this Memorandum Opinion and Order.

### I.  Procedural Background

Plaintiff, who was born on March 17, 1945, filed his initial application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act on February 18, 1997. **Tr. 86-88.** Plaintiff alleged that he became unable to work as a result of his disabling conditions on January 30, 1997. **Tr. 86.** Plaintiff's application for benefits was denied at the initial level on August 5, 1997, **Tr. 71-75,** and at the reconsideration level on April

10, 1998, **Tr. 78-80.**  Plaintiff thereafter appealed by filing a request for hearing by an administrative law judge ("ALJ") on April 18, 1998.  **Tr. 81-82.**

The hearing before the ALJ was held on September 16, 1998, at which Plaintiff appeared and was represented by an attorney.  **Tr. 29-67.**  Plaintiff alleged that he was disabled as a result of a heart murmur and a seizure disorder.  **Tr. 42.**  In a decision dated December 1, 1998, the ALJ denied Plaintiff's claims for DIB and SSI.  **Tr. 11-18.**  Plaintiff then filed a request for review with the Appeals Council on December 3, 1998.  **Tr. 7.** The Appeals Council denied Plaintiff's request for review on February 19, 1999, **Tr. 4-5,** and thereby rendered the ALJ's decision the final decision of the Commissioner of Social Security ("Commissioner").  *See* 20 C.F.R. §§ 404.981, 416.1481.

Plaintiff appealed by filing suit in this Court on April 15, 1999.  *See Kingsley v. Apfel,* No. CIV 99-0421 JP/JHG.  After reviewing Plaintiff's Motion to Reverse or Remand Administrative Agency Decision, the Honorable Joe H. Galvan recommended that the case be remanded for further administrative proceedings.  **Tr. 354-361.**  The Honorable James A. Parker adopted Judge Galvan's recommendations on June 30, 2000, and the case was remanded to the Commissioner.  **Tr. 362-363.**

Pursuant to the Court's Order of Remand, the ALJ held a new hearing on July 6, 2001, **Tr. 287-329,** and issued a new decision on February 21, 2002 in which he found that Plaintiff became disabled as of June 1, 2001.  **Tr. 269-281.**  Although the ALJ's new decision was partially favorable to Plaintiff, Plaintiff disputes the determination that he was not disabled until June 1, 2001. Accordingly, on April 26, 2002, Plaintiff filed this action for judicial review pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  The parties have consented to the undersigned United States Magistrate Judge conducting all proceedings, and on April 15, 2003 this case was reassigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) **[docket # 15].**

## II.  Standard of Review

This Court may only review the Commissioner's decision to determine whether it is supported by substantial evidence and whether correct legal standards were applied.  *Andrade v. Secretary of Health & Human Servs.,* 985 F.2d 1045, 1047 (10th Cir. 1993).  The Court should not re-weigh the evidence, nor should it substitute its judgment for that of the Commissioner.  *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir. 1994).  Instead, the Court should examine the record to determine whether the Commissioner's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir. 1993).  The "substantial evidence" standard is satisfied by more than a scintilla, but less than a preponderance, of evidence.  *Id.*  However, evidence is not substantial if it is overwhelmed by other evidence or if it constitutes a mere conclusion.  *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir. 1989).

A sequential five-step analysis is used to determine whether an adult claimant is disabled.  *See Williams,* 844 F.2d at 750-52; 20 C.F.R. §§ 404.1520, 416.920.  The first question is whether the claimant is engaged in substantial gainful activity.  *Williams,* 844 F.2d at 750.  If so, the claimant is not disabled; if not, the analysis proceeds to step two.  *Id.*  At step two, the question is whether the claimant has an impairment or combination of impairments that is severe.  *Id.*  If not, the claimant is not disabled; if the claimant makes the required showing of severity, the analysis proceeds to step three.  *Id.* at 750-51.  At step three, the question is whether the claimant has an impairment or combination of impairments that meets or equals an impairment listed at Appendix 1, Subpart P, of 20 C.F.R. Part 404 ("Listings" or "Listed Impairment").  *Id.* at 751.  If so, the impairment is considered to be presumptively disabling.  *Id.*  If not, the analysis proceeds to step four, where the question is whether the impairment prevents the claimant from doing past work.  *Id.*  The claimant

is not disabled if he or she can perform past work. *Id.* If the claimant cannot, the analysis proceeds to step five, where the burden shifts to the Commissioner to establish that the claimant has the residual functional capacity ("RFC") "to perform other work in the national economy in view of his age, education and work experience." *Id.* (quoting *Bowen v. Yuckert,* 482 U.S. 137, 142 (1987)). The claimant is entitled to benefits unless the Commissioner establishes that the claimant can "perform an alternative work activity and that this specific type of job exists in the national economy." *Id.* (quoting *Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984)).

### III.  Summary of the ALJ's Decision

At step one of the sequential five-step analysis, the ALJ found that Plaintiff "engaged in substantial gainful activity after his alleged onset date, but not after August 1997." **Tr. 279.** The ALJ determined at step two that Plaintiff's seizure disorder and cardiac impairment are severe, but at step three the ALJ found that none of Plaintiff's impairments met or equaled any Listed Impairment before June 1, 2001. **Tr. 275.** The ALJ also found that Plaintiff had a mental impairment that met Listings 12.06 and 12.08 as of June 1, 2001, and was thus disabled as of that date. **Tr. 273, 279.** With respect to the period from Plaintiff's alleged onset date of January 30, 1997 to June 1, 2001, the ALJ found at step four that Plaintiff retained the residual functional capacity ("RFC") for most medium work, and could have performed his past relevant work as a laundry worker and laborer. **Tr. 277.** Although a claimant should be found not disabled at step four if he or she can perform past work, *Williams v. Bowen,* 844 F.2d 748, 751 (10th Cir. 1988), the ALJ proceeded to step five because he found "inconsistencies about his past work among Claimant's statements of record . . . ." **Tr. 277.** At step five, the ALJ concluded that prior to June 1, 2001, Plaintiff retained the capacity to perform a significant number of jobs existing in the regional and national economies including laundry worker,

4

cleaner or housekeeper, ticket taker, and laundry spotter. **Tr. 278.** Accordingly, the ALJ concluded

that Plaintiff was not disabled from January 30, 1997 until June 1, 2001. **Tr. 278.**

## IV.  Discussion

Plaintiff contends that the ALJ erred when he found that Plaintiff was not disabled from

January 30, 1997 to June 1, 2001.  I will address each of his arguments below.

## A.  Step Two

Plaintiff contends that the ALJ erred at step two of the sequential five-step analysis when he

determined that Plaintiff's seizure disorder and mental impairments were not severe prior to June 1,

2001.  However, contrary to Plaintiff's argument, the ALJ concluded at step two that Plaintiff's

seizure disorder was severe throughout the period under review.[1] **Tr. 275, 279.**  I will, therefore,

address Plaintiff's step two argument only as it pertains to his mental impairments.

To meet his burden of proof at step two, a claimant is only required to make a *de minimis*

showing of medical severity.  *Williams v. Bowen,* 844 F.2d 748, 751 (10th Cir. 1988).  Thus, an ALJ

may find that an impairment is not severe only if medical evidence establishes that the claimant's

impairment has no more than a minimal effect on his or her ability to perform basic work activities.

SSR 85-28.  Basic work activities means "the abilities and aptitudes necessary to do most jobs," and

includes physical functions as well as "[u]se of judgment," "[r]esponding appropriately to supervision,

co-workers and usual work situations," and "[d]ealing with changes in a routine work setting."  20

---

[1]Plaintiff asserts that the ALJ found his impairments were severe only after June 1, 2001 because, for the period before that date, the ALJ stated that "the record does not establish a physical or mental impairment so severe as to preclude all work activity for any 12-month period of time." **Tr. 271.**  However, this statement is not a finding that plaintiff had no severe impairments for step two purposes.  Rather, this statement was simply another way of saying that Plaintiff was not *disabled* before June 1, 2001.  *See*  42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 1382c(a)(3)(a).

C.F.R. §§ 404.1521, 416.921.  If the claimant makes a *de minimis* showing of medical severity, the ALJ must proceed to step three.  *Williams,* 844 F.2d at 751.  The ALJ in this case determined that there was no evidence in the record that suggested a mental impairment that was severe enough to interfere with Plaintiff's ability to work prior to June 1, 2001.  **Tr. 272-273.**  Plaintiff, on the other hand, contends that the ALJ disregarded evidence that demonstrated that his mental impairments had more than a minimal effect on his ability to perform basic work activities.  For the following reasons, I find that the ALJ erred when he failed to discuss certain evidence that is significantly probative as to the issue of whether Plaintiff suffered from a severe mental impairment before June 1, 2001.

At least two doctors who evaluated Plaintiff during the period between January 30, 1997 and June 1, 2001 found that Plaintiff had a global assessment of functioning ("GAF") score of 50. Plaintiff was evaluated on February 2, 1998 by Dr. Paula Hughson.  **Tr. 202-208.**  Dr. Hughson's report indicates that, although Plaintiff had never been treated for depression or seen a psychiatrist, **Tr. 204,** he had a history of depressive episodes, **Tr. 207,** a lifelong history of below average functioning, **Tr. 207,** and a GAF of 50 "with serious impairment in social, occupational and school functioning," **Tr. 208.**  Subsequently, in November 1999, Plaintiff went to the VA behavioral health clinic for evaluation of his depression and treatment recommendations.  **Tr. 384.**  At that time, Plaintiff reported feeling depressed nearly all day, every day, for the past three years.  **Tr. 384.**  The psychology intern and staff psychologist who treated Plaintiff also assigned him a GAF of 50, diagnosed dysthymic disorder, and rated his insight and judgment as fair to poor.  **Tr. 385-86.**

A GAF score measures an individual's overall level of psychological, social and occupational functioning.  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  As noted above, on two occasions before June 1, 2001, Plaintiff received a GAF

rating of 50.  The description for persons whose GAF score falls between 41 and 50 is as follows:

> Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job).

*Id.* at 34.  When Dr. Hughson assigned Plaintiff a GAF score of 50, she specifically noted that his GAF rating included "serious impairment in social, occupational and school functioning." ***See* Tr. 208.**  A medical finding that Plaintiff suffered a "serious impairment in social, occupational and school functioning" prior to June 1, 2001 would seem to indicate that Plaintiff's mental impairments had more than a minimal effect on his ability to perform basic work activities during the period under review.  At the very least, I find that Plaintiff's GAF score prior to June 1, 2001 provides significantly probative evidence relating to his ability to perform basic work activities.  The fact that the ALJ found that Plaintiff had no severe mental impairment prior to June 1, 2001 necessarily means that the ALJ rejected this evidence.  Yet, the ALJ never discussed this evidence in his step two analysis.  I find that the ALJ's failure to discuss evidence that two medical professionals assigned Plaintiff a GAF score of 50 prior to June 1, 2001 constitutes legal error, for "in addition to discussing the evidence supporting his decision, the ALJ also must discuss uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater,* 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Accordingly, on remand the ALJ must consider and discuss Plaintiff's GAF score in his step two analysis.  If the ALJ determines on remand that Plaintiff had a severe mental impairment at step two, the ALJ must proceed with the sequential five-step analysis.

## B.  Step Three

Plaintiff also contends that the ALJ ignored certain evidence relating to his seizures and mental impairments without specifying at what step of the sequential analysis the ALJ should have

considered this evidence.  In addition to his step two arguments, I will assume Plaintiff contends that the ALJ should have considered this evidence at step three.  However, because the ALJ determined that Plaintiff did not have a severe mental impairment at step two, he did not decide at step three whether Plaintiff's mental impairments met or equaled one of the Listings prior to June 1, 2001. Accordingly, I will only review the question of whether the ALJ erred by ignoring evidence relevant to whether Plaintiff's seizure disorder was severe enough to meet or equal a Listed Impairment.

> The Listings that pertain to seizure disorders require the following:
>
> 11.02  Epilepsy – convulsive epilepsy (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.  With:
> A.      Daytime episodes (loss of consciousness and convulsive seizures) or
> B.      Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.
> 11.03  Epilepsy – nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed  description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.  With alternation of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

For the following reasons, I find that the ALJ's step three determination that Plaintiff's seizure disorder did not meet or medically equal a Listed Impairment is supported by substantial evidence.

Plaintiff testified that he has a grand mal seizure about every four or five days when he takes the anti-seizure medication Tegretol, **Tr. 300,** and that he had grand mal and petit mal seizures weekly when he took another medication, Dilantin.  **Tr. 301.**  Plaintiff's sister testified that Plaintiff has four or five grand mal seizures per month, **Tr. 317,** and that he has several petit mal seizures every morning, **Tr. 319.**  However, the ALJ discounted this testimony for several reasons, and concluded in any event that Plaintiff's seizure disorder did not meet or medically equal a Listed

Impairment at any time during the period under review.  Among other things, the ALJ cited Plaintiff's "long, ongoing history of noncompliance with his prescribed anticonvulsant" as a reason for finding that Plaintiff's seizure disorder did not meet the Listings.  **Tr. 274.**

The ALJ noted that the applicable Listings require compliance with prescribed treatment.  *See* Listings 11.02, 11.03.  Indeed, the Administration has promulgated an opinion that states:

> To meet the listing criteria, major motor seizures must be occurring more frequently than once a month (Listing 11.02), or minor motor seizures must occur more frequently than once weekly (Listing 11.03), in spite of at least 3 months of prescribed treatment. . . .  An allowance on the basis of meeting listing level severity is warranted only when the individual is following a treatment regimen prescribed by his or her treating source and continues to have seizures at the specified frequency.

SSR 87-6.  Plaintiff does not identify any evidence to refute the ALJ's finding that he was non-compliant with treatment prescribed for his seizures.  Moreover, the following evidence supports the ALJ's determination that, during the period under review, Plaintiff did not consistently follow a treatment regimen prescribed by a physician as required by the Listings.

On several occasions in 1998 and 1999, Plaintiff's medical records indicate that his physicians believed he suffered seizures due to non-compliance with his prescribed medication regimen.[2]  For example, on August 21, 1998, Plaintiff went to the ER after having several grand mal seizures.  **Tr. 436.**  At that time, Plaintiff's sister reported that Plaintiff would not take his medication unless she forced him to, and that he often missed doses.  **Tr. 436-437.**  The cause of Plaintiff's seizures was

---

[2]By way of contrast, on occasions when Plaintiff reported that he had been taking his medication, he denied seizure activity.  For example, on October 13, 1998, Plaintiff reported being compliant with his medication regimen, and denied having any seizures.  **Tr. 434.**  On November 4, 1998, Plaintiff also reported that he had been compliant with his medication with his sister's help, and that he had not had any seizures since his last visit to the ER.  **Tr. 428.**  Again, on December 4, 1998, Plaintiff's medical records indicate that he reported that he was taking his dilantin regularly, with his sister's help.  **Tr. 426, 447.**  His last dilantin level in November 1998 was reported to be within therapeutic range, and the Plaintiff reported having no seizures since August 1998.  **Tr. 426, 447.**

diagnosed as "likely due to his non-compliance. . . ." **Tr. 437.** On October 5, 1998, Plaintiff's medical records indicate that he had been seen in neurology on September 2, 1998 for seizures, and the impression had been that Plaintiff was non-compliant with his medication regimen. **Tr. 431.** His records also noted that, while Plaintiff denied non-compliance, that remained a possible explanation given his dilantin level of 11. **Tr. 431.** Plaintiff's history of noncompliance is noted again in his medical records dated November 4, 1998. **Tr. 428.** On March 4, 1999, Plaintiff's medical records note that his neurologist recommended that he increase his dose of medication to 450 mg. per day, but that Plaintiff had never done so "due to inability to chew tablets." **Tr. 421-422.**

In the year 2000, Plaintiff's medication levels were found to be outside of therapeutic levels on more than one occasion. On April 8, 2000, Plaintiff's medical records indicate that his dilantin level was not in the therapeutic range. **Tr. 507.** Nevertheless, his records indicate that he had not had a seizure "for some months." **Tr. 507.** Subsequently, on August 31, 2000, Plaintiff's dilantin levels were found to be in the toxic range. **Tr. 504.** Plaintiff's medical care providers determined that he needed to be monitored closely, **Tr. 504,** and subsequently determined that his medication should be changed, **Tr. 501.** Plaintiff was then taken off dilantin on September 6, 2000 and started on Tegretol, which is also known as carbamazepine. **Tr. 490, 500-501.**

On January 26, 2001, Plaintiff's medical records indicate that his seizures had been well controlled on his current dose of carbamazepine. **Tr. 486.** His records indicate that Plaintiff's one breakthrough seizure apparently occurred after he missed a morning dose of medication. **Tr. 486.** Plaintiff also reported that he occasionally doubled up on his medication when he missed a dose. **Tr. 486.** His physician discussed with him the danger of doing this, and Plaintiff agreed to try to increase compliance in his medication regimen by using a pill box. **Tr. 486.** On February 8, 2001, Plaintiff's

10

medical records indicated that his seizures were well controlled if he took his Tegretol regularly.  **Tr. 484.**  His records from that date also indicate that Plaintiff tended to forget to take his noon pill, and was advised to carry an alarm clock to remind him to take that pill.  **Tr. 484.**

I find that the foregoing evidence provides substantial support for the ALJ's determination that Plaintiff's seizure disorder did not meet the Listings during the period under review due to Plaintiff's noncompliance with prescribed treatment.  Accordingly, I find that the ALJ's step three determination as it pertains to Plaintiff's seizure disorder should be affirmed.

### C.  Step Four

Step four of the sequential five-step analysis is comprised of three phases.  *Winfrey v. Chater,* 92 F.3d 1017, 1023 (10th Cir. 1996).  First, the ALJ must assess the claimant's residual functional capacity ("RFC").  *Id.*  Second, the ALJ must "determine the physical and mental demands of Plaintiff's past relevant work," and third, the ALJ must determine "whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one."  *Id.*  Since Plaintiff makes no cognizable argument about the demands of his past relevant work, I assume that he does not dispute the ALJ's ruling at the second and third phases of the step four inquiry.  On the other hand, since Plaintiff asserts that the ALJ ignored evidence that indicates that he suffered functional restrictions as a result of his seizures and his mental impairments prior to June 1, 2001, I will assume that Plaintiff disputes the ALJ's RFC assessment.

An RFC assessment, which provides a measurement of what a claimant can still do despite the limitations caused by his or her impairments, is used to determine whether a claimant can still do past work or any other work at steps four and five of the sequential analysis.  20 C.F.R. §§ 404.1545(a), 416.945(a).  An ALJ must "consider the limiting effects of all [of a claimant's]

impairment(s), even those that are not severe, in determining [a claimant's] residual functional capacity." 20 C.F.R. §§ 404.1545(e), 416.945(e).  The ALJ determined that for the period prior to June 1, 2001, Plaintiff retained the RFC for medium work, except that Plaintiff could not climb ropes, scaffolding, or ladders, swim, or do work that would expose him to heights or other hazards such as open machinery, and could not work alone.  **Tr. 277, 279.**

Plaintiff's first contention is that the ALJ ignored evidence, including statements by his sister, establishing that he had frequent, regular seizures. Pl.'s Mem. Br. at 11-12.  Contrary to Plaintiff's assertion, however, the ALJ considered testimony given by both Plaintiff and his sister regarding the frequency of Plaintiff's seizures and found that it was not credible for several reasons including the following.  First, the ALJ cited a form that indicates that Plaintiff's brother had never seen the petit mal seizures described by Plaintiff and his sister.  **Tr. 158.**  The ALJ wrote that this was "remarkable" given Plaintiff's and his sister's claim that Plaintiff suffers several of these seizures each day.  **Tr. 274.** Second, the ALJ cited an instance in which Plaintiff's physician did not think Plaintiff suffered a seizure despite Plaintiff's claim that he did.  **Tr. 427-428.**  Third, on several occasions Plaintiff reported having fewer seizures to physicians than he and his sister testified to at the hearing.  **Tr. 386** (Plaintiff reported that his last seizure prior to November 15, 1999 was in March, 1999); **Tr. 497** (in May 2000, Plaintiff reported having 3 small seizures in past two months); **Tr. 507** (in April 2000 Plaintiff reported not having seizures for some months).  In reviewing the ALJ's determination, I cannot re-weigh the evidence or substitute my judgment for that of the ALJ.  *See Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir. 1994).  I must affirm if the ALJ's determination is supported by more than a scintilla, but less than a preponderance, of evidence.  *See Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir. 1993).  Given this standard of review, I find that the foregoing evidence provides

sufficient support for the ALJ's determination that testimony by Plaintiff and his sister regarding the frequency of Plaintiff's seizures lacked credibility.

Plaintiff also contends that the ALJ ignored evidence indicating that after one grand mal seizure Plaintiff suffered "several days of memory deficits" and was unable to recognize his sister. Pl.'s Mem. Br. at 11-12. This evidence is based upon a report given on September 24, 1999 by Plaintiff's sister. **Tr. 389.** However, Plaintiff does not explain how, if at all, consideration of this evidence would have affected the ALJ's RFC assessment. As I have previously noted, the ALJ included in his RFC assessment restrictions ordinarily attendant to a seizure disorder, i.e., the ALJ found that Plaintiff "could not perform jobs that would require him to climb ladders, scaffolding, or ropes, swim, or work alone; and he was restricted to working in areas where he would not be exposed to hazards, such as heights and open machinery." **Tr. 279.** Moreover, I have found only one instance documented in the record where Plaintiff may have suffered a grand mal seizure of this level of severity. Indeed, at the hearing before the ALJ, Plaintiff's sister testified that when Plaintiff had a grand mal seizure, it usually lasted four to five minutes, and took approximately another thirty minutes before Plaintiff was "all the way out of it." **Tr. 317.** Because there is evidence of only one instance of a grand mal seizure in which Plaintiff may have suffered cognitive deficits lasting more than one day, I do not think this evidence would have altered the ALJ's RFC assessment or resulted in additional restrictions on Plaintiff's ability to work. I therefore find no reversible error in the ALJ's failure to discuss this evidence. *See generally Clifton v. Chater,* 79 F.3d 1007, 1009-10 (10th Cir. 1996) (an ALJ is not required to discuss every piece of evidence; he is only required to discuss evidence supporting his decision, uncontroverted evidence he chooses not to rely upon, and significantly probative evidence he rejects).

13

Plaintiff's next argument is that the ALJ ignored Dr. Anna Vigil's determination that his occupational potential was severely limited because of his frequent seizures.  However, the ALJ apparently did so because Dr. Vigil's opinion was based upon Plaintiff's reports of the frequency of his seizures, and the ALJ determined that Plaintiff's reports were not reliable.  *See* **Tr. 276** (discounting medical experts' opinions based on Plaintiff's testimony); **Tr. 276-277** (Dr. Vigil was given the impression that Plaintiff's seizures were "much more frequent than reflected in the medical record").   Because I have found no reversible error in the ALJ's determination that testimony by Plaintiff and his sister regarding the frequency of Plaintiff's seizures lacked credibility, I cannot say that the ALJ erred in discounting Dr. Vigil's report.

Plaintiff also contends that the ALJ ignored evidence establishing that he suffered from anxiety and depression prior to June 1, 2001.  Plaintiff points to evidence indicating that he had been evaluated on six occasions from February 1998 through June 2001 for anxiety and depression and had been prescribed an antidepressant in June 1999, a psychiatric report by Dr. Paula Hughson generated in February 1998, an assessment at the VA hospital in November 1999, and an assessment by an Administration doctor in January 1999.

Contrary to Plaintiff's arguments, the ALJ considered much of the evidence cited by Plaintiff but cited several reasons for discounting Plaintiff's claim of significant mental impairments prior to June 1, 2001.  **Tr. 272.**  For example, rather than ignoring evidence that Plaintiff saw a physician for anxiety and depression on several occasions, the ALJ considered this evidence but found that Plaintiff had made only scattered comments to his doctors about psychological symptoms and had not sought ongoing treatment for mental impairments during the period under review.  **Tr. 272.**  Likewise, the ALJ considered the fact that Plaintiff had been prescribed antidepressant medication in June 1999,

but discounted that evidence because Plaintiff stopped taking the medication on his own after claiming that it made him feel worse. **Tr. 272.** The ALJ also considered Dr. Hughson's assessment, but concluded that "Dr. Hughson found no major abnormalities in Claimant's mental status and she did not identify an identifiable mental impairment, although she did find indications of problems with attention and concentration and somewhat reduced mental function." **Tr. 272.**[3]

Despite the fact that the ALJ discussed his reasons for discounting most of the evidence cited by Plaintiff, I find that the ALJ erred when he failed to discuss certain evidence in the record. As I have noted in my step two analysis, Plaintiff's global assessment of functioning was rated at 50 on two occasions prior to June 1, 2001, **Tr. 208, 385-86,** and a GAF of 50 indicates a serious impairment in social, occupational or school functioning. Evidence indicating that Plaintiff has a serious impairment in his social, occupational or school functioning clearly should have been considered in an assessment of Plaintiff's RFC, for by definition an RFC provides a measure of a claimant's ability to function in the work place despite his or her impairments. *See* 20 C.F.R. §§ 404.1545, 416.945. As was the case with step two, I find that Plaintiff's GAF score of 50 prior to June 1, 2001 constitutes significantly probative evidence that the ALJ was required to discuss in his RFC assessment, and his failure to discuss this evidence constitutes legal error.

### D. Step Five

At step-five of the sequential five-step analysis, the burden shifts to the Commissioner to

---

[3]Additionally, the ALJ observed that while Plaintiff complained of depression and anxiety in early 1999, he was at the same time "using marijuana on a daily basis and staying up at night to use the drug." **Tr. 272.** According to the ALJ, "[n]ot only did this behavior have the effect of stimulating seizure activity, it also had a negative impact on Claimant's psychological condition." **Tr. 272.** The ALJ also noted that treatment records from September 2000 indicated that Plaintiff suffered from "situational" anxiety. **Tr. 272.**

establish that the claimant has the RFC "to perform other work in the national economy in view of his age, education and work experience."  Plaintiff asserts that the ALJ committed the following errors at step five.

### 1.  Whether the ALJ Erred by Failing to Consider Vocational Evidence

Plaintiff's first contention is that the ALJ erred when he failed to consider vocational evidence provided by Ken Williams, who is a licensed mental health counselor.  Mr. Williams evaluated Plaintiff in September 1998, **Tr. 167-172,** and subsequently reviewed the ALJ's unfavorable decision as well as his own previous disability evaluation, **Tr. 340-341.**  In both reports, Mr. Williams concluded that Plaintiff had "lost total access to the competitive labor market." **Tr. 172, 341.**  Rather than relying upon Mr. Williams' reports, the ALJ called Pamela Bowman to testify as a vocational expert at the hearing.  **Tr. 321-328.** The ALJ never mentioned Mr. Williams' reports in his decision, and based his conclusion that Plaintiff could perform a number of jobs prior to June 1, 2001 upon Ms. Bowman's testimony.  Defendant apparently concedes that the ALJ did not mention Mr. Williams' reports, but argues that the ALJ's statement to the effect that he had considered all of the evidence in the record is legally sufficient.  For the following reasons, I disagree with Defendant and find that the ALJ was required to explain why he rejected Mr. Williams' reports.

The authority I have found that comes closest to addressing the issue is an unpublished Tenth Circuit opinion, *Smith v. Chater,* 1996 U.S. App. LEXIS 25993 (10th Cir. 1996).[4]  In *Smith*, the plaintiff was denied the opportunity to present testimony by a vocational expert ("VE") at the hearing before an ALJ and instead submitted a written report prepared by her VE.  The ALJ did not discuss

---

[4]Although unpublished opinions are not binding precedent in the Tenth Circuit, *see* 10th Circuit Rule 36.3, I find the Court's analysis helpful in this case.

the VE's report, and simply relied upon the grids in his step five analysis.  The Court of Appeals

concluded that the ALJ erred when he failed to discuss the VE's report because an ALJ has a duty

"to consider all materials submitted to him in a particular case."  *Smith,* 1996 U.S. App. LEXIS

25993 at 5 (citing 42 U.S.C. § 423(d)(5)(B)).  In light of this duty, the Court stated that, "[w]hile the

ALJ need not accept the VE's conclusion that [the plaintiff] is disabled, . . . the ALJ must give

reasons for rejecting the report. . . ."  *Id.*  Indeed, the Court made clear that "[o]nce information is

present in the record, the ALJ must discuss it and present reasons for disregarding conclusions

contrary to his determination."  *Id.* at 5-6.  I agree with the principles underlying the *Smith* decision.

While I find that the ALJ was not required to accept Mr. Williams' ultimate determination that

Plaintiff was disabled, I find that the ALJ was required to consider the evidence and explain why he

was disregarding it.[5]  His failure to do so constitutes legal error.

### 2.  Whether the ALJ Erred by Ignoring Answers to Hypothetical Questions

Plaintiff's final contention is that the ALJ erred when he ignored answers by a VE to

hypothetical questions that included limitations that were supported by the evidence.  Pamela

Bowman testified that a person with the following limitations could perform the jobs of a laundry

worker, mail sorter, ticket taker, and housekeeper:  lift 50 pounds occasionally and 25 pounds

frequently; stand, sit or walk up to 6 hours in an 8 hour day; limited to simple routine work; due to

seizures should not have a job that would involve climbing rope, scaffolding, ladders, or other

---

[5]Defendant contends that the ALJ was not required to give specific reasons for rejecting Mr. Williams' opinion because he was not an acceptable medical source.  However, the regulations Defendant cites as support pertain to sources who may provide evidence to establish *a medically determinable impairment.  See* 20 C.F.R. §§ 404.1513(a), 404.1527(a).  Mr. Williams' reports were not proffered to establish a medically determinable impairment, but were instead proffered to establish that there are no jobs in the economy that Plaintiff could perform.

hazardous activities such as being around unprotected heights or moving machines, and should not work alone. **Tr. 323-324.** In response to questioning by Plaintiff's counsel, Ms. Bowman stated that the jobs available to a claimant in the previous hypothetical would be reduced by fifty-percent if he had moderate limitations in ability to understand and remember very short and simple instructions. **Tr. 327.** Ms. Bowman testified that if the claimant also suffered severe limitations in ability to carry out short and simple instructions, sustain ordinary routine without special supervision, and make simple work related decisions, none of the jobs she mentioned would be available to the claimant. **Tr. 328.** Ms. Bowman also testified that no work would be available to a person with additional limitations including daily naps, medication side effects of afternoon sleepiness and dizziness, grand mal seizures 4 to 5 days per month, petit mal seizures 1 to 2 times per day that include urinating on himself, and memory problems. **Tr. 324-325.** According to Ms. Bowman, a claimant could maintain employment if he did not have more than two seizures in two months. **Tr. 325.**

Hypothetical questions posed to a VE "must reflect with precision all of [a claimant's] impairments, but they need only reflect impairments and limitations that are borne out by the evidentiary record." *Decker v. Chater,* 86 F.3d 953, 955 (10th Cir. 1996). I have previously found that substantial evidence supports the ALJ's determination that Plaintiff's and his sister's testimony relating to the frequency of his seizures lacked credibility. Accordingly, I find that the ALJ was not required to include in his hypothetical the limitation of grand mal seizures occurring four to five times per month and petit mal seizures occurring once or twice per day. I also find, however, that the ALJ should have discussed the side effects of Plaintiff's anti-seizure medication and, if the existence of side effects was supported by the evidence, he should have included any resulting limitations in his hypothetical to the VE. *See* 20 C.F.R. Part 404, Appendix 1, Subpart P, § 11.00A ("[w]here

18

adequate seizure control is obtained only with unusually large doses [of antiepileptic drugs], the possibility of impairment resulting from the side effects of this medication must also be assessed."). Additionally, since I have remanded for re-assessment of Plaintiff's mental RFC, I need not address Plaintiff's contentions that the ALJ failed to include mental limitations in his hypotheticals at this time. If the ALJ obtains additional vocational testimony on remand, he should include all limitations he finds on re-assessment in his hypotheticals to the VE.

### V.  Conclusion and Summary

In sum, I find that the ALJ erred at step two of the sequential five-step analysis when he failed to discuss evidence that is significantly probative with respect to the question of whether Plaintiff suffered a severe mental impairment prior to June 1, 2001.  I further find that the ALJ erred at step four of the sequential five-step analysis when he failed to discuss evidence that is significantly probative with respect to the effect of Plaintiff's mental impairments on his residual functional capacity.  In addition, I find that the ALJ erred at step five when he failed to explain why he disregarded vocational evidence provided by Ken Williams, and when he failed to discuss side effects of Plaintiff's anti-seizure medication.

Accordingly, this matter shall be remanded to the Commissioner of Social Security to conduct additional proceedings, which shall include:

1)      At step two of the sequential five-step analysis, the ALJ should re-consider the question of whether Plaintiff had a mental impairment that was severe prior to June 1, 2001.  The ALJ should consider all psychological evaluations of Plaintiff that were conducted prior to June 1, 2001, and specifically address Plaintiff's GAF score in his decision.  If the ALJ finds that Plaintiff's mental impairments had more than a minimal effect on his ability to perform basic work activities prior to

19

June 1, 2001, the ALJ should find that Plaintiff had a mental impairment that was severe and proceed to analyze Plaintiff's mental impairments at step three of the sequential analysis.

2)      At step four of the sequential five-step analysis, the ALJ should re-assess Plaintiff's residual functional capacity for the relevant time period prior to June 1, 2001.  In determining Plaintiff's RFC, the ALJ must consider the limiting effects of all of Plaintiff's impairments, even those that are not severe.  Thus, whether or not the ALJ finds that Plaintiff's mental impairments were severe at step two on re-consideration, the ALJ should consider all psychological evaluations of Plaintiff that were conducted prior to June 1, 2001, and specifically discuss Plaintiff's GAF score in his re-assessment of Plaintiff's RFC.

3)      If the ALJ's re-assessment of Plaintiff's RFC at the first phase of step four yields a different result, the ALJ should re-consider the remaining phases of the step four inquiry.  That is, if Plaintiff's RFC re-assessment yields a different result, the ALJ should determine whether Plaintiff has the ability to meet the physical and mental demands of his past relevant work despite the physical and mental limitations attendant to his re-assessed RFC.

4)      If after taking the foregoing steps the ALJ determines at step four that Plaintiff cannot perform his past relevant work, the ALJ must proceed to step five and determine whether Plaintiff had the RFC during the relevant time period to perform other work that existed in significant numbers in the regional and national economies.  In doing so, the ALJ must discuss all significantly probative evidence in the record, including the reports by Ken Williams, and, if on remand the ALJ obtains further testimony by a vocational expert, he must include in hypotheticals posed to the VE all of Plaintiff's impairments and limitations that are borne out by the evidentiary record.

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion to Reverse or Remand Administrative Agency Decision **[docket # 10]** is **GRANTED IN PART,** and this matter shall be remanded to the Commissioner of Social Security for further proceedings in accordance with this Memorandum Opinion and Order.


_____
**W. DANIEL SCHNEIDER**
**UNITED STATES MAGISTRATE JUDGE**